## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., <br><br> CENTER FOR BIOLOGICAL DIVERSITY, <br><br> *and* <br><br> ANIMAL WELFARE INSTITUTE, <br><br><br>                Plaintiffs, <br><br>     v. <br><br> GINA RAIMONDO, *in her official capacity as Secretary of Commerce*, <br><br> UNITED STATES DEPARTMENT OF COMMERCE, <br><br> JANET COIT, *in her official capacity as Assistant Administrator of the National Marine Fisheries Service*, <br><br> NATIONAL MARINE FISHERIES SERVICE, <br><br> JANET YELLEN, *in her official capacity as Secretary of the Treasury*, <br><br> UNITED STATES DEPARTMENT OF THE TREASURY, <br><br> ALEJANDRO MAYORKAS, *in his official capacity as Secretary of Homeland Security*, <br><br> *and* <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY. <br><br>                Defendants. | Civil Action No. 1:24-cv-00148 <br><br><br><br><br> **COMPLAINT** |

## Introduction

1.      The greatest global threat to marine mammals is fisheries bycatch, the accidental entanglement or capture of an animal in fishing gear. More than 650,000 marine mammals are killed or seriously injured annually when fishing gear hooks, entangles, or traps them.

2.      Congress enacted the Marine Mammal Protection Act of 1972, 16 U.S.C. § 1361 *et seq.* (the "MMPA") to combat the threat from commercial fisheries and provide marine mammals protection against human activities.

3.      In passing the MMPA, Congress recognized that marine mammals are "a significant functioning element in the ecosystem of which they are a part." 16 U.S.C. § 1361(2).

4.      To protect marine mammals and their habitats, Congress resolved that marine mammal species and population stocks "should not be permitted to diminish below their optimum sustainable population." *Id.* § 1361(2).

5.      Optimum sustainable population is defined as "the number of animals which will result in the maximum productivity of the population or the species, keeping in mind the carrying capacity of the habitat and the health of the ecosystem . . . ." *Id.* § 1362(9).

6.      In light of the ecological importance of marine mammals, and because marine mammals "have proven themselves to be resources of great international significance, esthetic and recreational as well as economic," Congress resolved that marine mammals "should be protected and encouraged to develop to the greatest

extent feasible commensurate with sound policies of resource management," reaffirming that the "primary objective" of such management should be "maintain[ing] the health and stability of the marine ecosystem." *Id.* § 1361(6).

7.    The MMPA is designed not only to reduce marine mammal bycatch within U.S. fisheries toward zero, but also to put economic pressure on foreign fisheries that export their products to the United States to do the same in order to access the U.S. seafood market. Final Fish and Fish Product Import Rule, 81 Fed. Reg. 54,390, 54,405 (Aug. 15, 2016) ("The MMPA requires the harvesting nation to provide evidence of compliance to maintain or gain access to the U.S. market; this process provides greater incentive for compliance . . . .") [hereinafter "Final Import Rule"].

8.    The MMPA's foreign fisheries framework is intended to address a global problem using the tools available to the United States, driving greater protection for dolphins, porpoises, seals, sea lions, whales, and other marine mammal species worldwide and guarding domestic commercial fishers from unfair competition.

9.    Under the MMPA, foreign fisheries exporting to the United States must meet U.S. standards for bycatch. If a foreign nation does not provide "reasonable proof" to the Secretary of Commerce that its export fisheries comply with U.S. standards for protecting marine mammals from harm in the course of commercial fishing operations, then the MMPA requires that the Secretary of the

Treasury "shall" ban importation of fish and fish products from those fisheries. 16 U.S.C. § 1371(a)(2).

10.     The MMPA also prohibits the importation of fish caught in a manner the U.S. does not permit its domestic commercial fisheries to utilize. 16 U.S.C. § 1372(c)(3).

11.     For over 50 years, Defendants, including the National Marine Fisheries Service ("NMFS"), a National Oceanic and Atmospheric Administration Line Office under the Secretary of Commerce tasked with implementing the MMPA, have largely failed to implement these import limitations. Decades have passed while foreign fisheries continue to engage in harmful fishing practices and sell the fish they catch to the U.S. market, in violation of the MMPA.

12.     Following a 2008 petition, NMFS began the rulemaking process to implement the MMPA's import provisions and create a process for determining whether all foreign fisheries exporting fish and fish products to the United States meet U.S. standards. In its 2015 proposed rule, NMFS stated that the regulation "should help ensure that the United States is not importing fisheries products harvested by nations that engage in the unsustainable bycatch of marine mammals[.]" Proposed Fish and Fish Product Import Rule, 80 Fed. Reg. 48,172, 48,190 (Aug. 11, 2015) [hereinafter "Proposed Import Rule"].

13.     In issuing its final rule, NMFS agreed with commenters who "supported efforts to level the playing field for U.S. fisheries, noting that American fishermen comply with the requirements of the MMPA in conducting their fishing

activities, and those efforts come at an increased cost, so it is only fair to U.S. fisheries that a level playing field exists such that importing fisheries abide by similar standards when introducing fish into the U.S. market." Final Import Rule, 81 Fed. Reg. at 54,408.

14.     When NMFS promulgated the Final Import Rule in 2016, it granted nations exporting fish and fish products to the United States a "one-time only" five-year extension to comply with the MMPA, which delayed the effective date of the Final Import Rule's implementation of the statutory ban on imports that do not meet U.S. standards to January 1, 2022. In response to commenters recommending a longer exemption period, NMFS stated that it "considers the five-year exemption period to be sufficient time for nations to develop regulatory programs for their fisheries subject to this rule." Final Import Rule, 81 Fed. Reg. at 54,408.

15.     Since then, NMFS has issued three more extensions, delaying the effective date of the Final Import Rule's implementation of the statutory import ban to, at least, January 2026.

16.     NMFS promulgated the most recent extension in November 2023, without any public notice or opportunity for comment. In doing so, NMFS not only continues to violate its nondiscretionary obligations under the MMPA, but also violated and continues to violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, as well.

17.    These statutory violations frustrate the policy enacted by Congress in 1972: to reduce, with a goal of eliminating, the deaths and serious injuries of marine mammals in fishing gear.

18.    Globally, marine mammals continue to suffer serious injuries and mortality when bycaught by commercial fisheries that do not meet U.S. standards, yet export to the U.S. market.

19.    Plaintiffs Natural Resources Defense Council, the Center for Biological Diversity, and the Animal Welfare Institute (collectively, "Plaintiffs") bring this case under the MMPA and the APA to compel Defendants to ban the importation of fish and fish products from foreign commercial fisheries that do not meet U.S. standards for the protection of marine mammals—as Congress required over fifty years ago.

## Jurisdiction

20.    This Court has jurisdiction pursuant to 28 U.S.C. § 1581(i). The ban on importation of fish products required by § 101(a)(2) and § 102(c)(3) of the MMPA, 16 U.S.C. §§ 1371(a)(2), 1372(c)(3), is an embargo, and the Court of International Trade has jurisdiction over any such ban, as well as actions relating to the ban's administration and enforcement. The APA provides the cause of action in this case, 5 U.S.C. §§ 701-706, and an actual, justiciable controversy exists between Plaintiffs and Defendants.

21.    This Court may grant the relief requested pursuant to §§ 101(a)(2) and 102(c)(3) of the MMPA, 16 U.S.C. §§ 1371(a)(2) and 1372(c)(3); the APA, 5 U.S.C.

§§ 706(1)-(2); the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; and the Court's equitable powers.

## Parties

### Plaintiffs

22.     Plaintiff Natural Resources Defense Council, Inc. ("NRDC") is a not-for-profit membership corporation founded in 1970 and organized under the laws of the State of New York. NRDC has hundreds of thousands of members and online activists. NRDC has worked for more than thirty years to implement and enforce the MMPA and to protect marine mammals in the United States and around the world. NRDC advocates, litigates, participates in teams mandated by the MMPA, and helps develop policy to reduce marine mammal mortality and serious injury from commercial fisheries.

23.     NRDC members live near and regularly travel to locations including the Gulf of Maine, Indian Ocean, and Northeast Atlantic where they delight in knowing marine mammals live. They plan to continue visiting these regions and hope to observe marine mammals in the future. NRDC members derive recreational, conservation, aesthetic, and other benefits from seeing marine mammals in the wild. These interests have been, currently are, and will continue to be directly, adversely, and irreparably affected by Defendants' violations of the law.

a.     For example, one NRDC Member, Nicola Hodgins, is a marine biologist and dolphin researcher, who studies and enjoys seeing marine mammals in the United Kingdom. She recently moved to a part of Scotland where she sees wildlife, including marine

mammals, on a daily basis, which she values for the impact it has on her aesthetic enjoyment, mental health, physical health, and quality of life. Ms. Hodgins goes to Tiumpan Head on the Isle of Lewis in Scotland every day to look for marine mammals and also crews for a whale watching company operating out of Stornoway harbor, where it is possible to see any of the United Kingdom's marine mammal species that inhabit the Northeast Atlantic.

b.  Another NRDC member, Roshan Balasubramanian, lives in Chennai, India, and is an avid diver. He has diving certifications from the Professional Association of Diving Instructors and Technical Diving International and has spent more than 500 hours underwater while diving. He has dived at most of the sites between Chennai and Puducherry, covering an approximately 95 mile stretch of India's East Coast. In addition to diving, Mr. Balasubramanian surfs, bodyboards, free dives, or swims in the sea almost every weekend. When doing these activities, he loves seeing marine mammals in their natural environment and believes that it significantly contributes to his happiness and quality of life as well as his aesthetic enjoyment of the marine environment. Mr. Balasubramanian has concrete plans to continue his local, weekly ocean activities and to make multiple

dives in 2024, having just completed a dive off the coast of Chennai in May. When he does these activities, he intends to look for the marine mammal species that make Indian waters their home.

c.  Another NRDC member, and member of the Center for Biological Diversity and the Animal Welfare Institute, Heather Keast, lives in Portland, Maine. She has a history of sailing with a friend in the summers, especially around the Portland area in Casco Bay, but also north to places including Sebasco and Boothbay Harbor. When she's on the water, she enjoys seeing marine mammals from the boat, including dolphins and seals, which increases her aesthetic enjoyment of her trips. She has plans to make a trip to visit the Calendar Islands in Casco Bay later this summer and will look for the marine mammals that make the Northwest Atlantic Ocean their home.

d.  And NRDC member Pat Foley also lives in Maine, in the town of Hiram. Ms. Foley considers herself a very coastal-oriented person and has been interested in marine mammals from a young age, with a distinct memory of being fascinated by marine mammals since a trip to Nantucket when she was a child. Ms. Foley also had a peak life experience when she saw thousands of porpoises jumping and playing on a whale watching trip out of

Newburyport after a hurricane had recently struck the area. She regularly makes trips to the coast to see the ocean and marine life and has plans to go at the end of this summer after the tourist season concludes. When there, she looks for marine mammals from which she derives aesthetic enjoyment—particularly dolphins, of which she is a big fan because she believes they are intelligent and interactive. Ms. Foley intends to continue her practice of taking trips to the coast and looking for the marine mammals that make the Northwest Atlantic Ocean their home.

24.     Entanglement, injury, and death of marine mammals in gillnet fisheries makes it less likely that these and other NRDC members will continue to view and enjoy marine mammals in the wild. The NRDC's members' interests have been, currently are, and will continue to be directly, adversely, and irreparably affected by Defendants' violations of the law.

25.     Plaintiff Center for Biological Diversity (the "Center") is a 501(c)(3) nonprofit corporation incorporated in the State of California with over 71,000 active members. The Center works through science and environmental law to advocate for the protection of endangered, threatened, and rare species and their habitats, both in the United States and abroad. Through its Oceans and International programs, the Center has worked for years to protect marine mammals in the United States and abroad that are threatened by unsustainable or harmful fishing practices,

including through advocacy, litigation, and participation as appointed members of five MMPA-mandated domestic teams that work to reduce marine mammal mortality and serious injury from commercial fisheries to a level approaching zero.

26.     The Center's members have a strong interest in protecting marine mammals and marine life, as well as ensuring that fish caught or sold in the United States are harvested in a manner that does not harm marine biological diversity. The Center has members who have visited and have specific plans to return to numerous locations around the globe to study, visit, and try to observe and photograph marine mammals in their natural habitat, including in Mexico, Indonesia, Ecuador, and South Africa.

a.     For example, one Center member, Brett Hartl, has a particular love for marine mammals and has taken numerous international trips to see and photograph marine mammals in the wild. Mr. Hartl has visited Indonesia three times, during which he has visited Sulawesi, Halmahera, Java, and West Papua, and spent a significant amount of time on and near the water, snorkeling and looking for marine mammals and other marine wildlife. Mr. Hartl has formerly seen Indo-Pacific bottlenose dolphins near Bali, and he has concrete plans to return to Indonesia in the summer and fall of 2025 to snorkel, dive, look for, and photograph marine mammal species, including pantropical

spotted dolphins, Indo-Pacific bottlenose dolphins, dugong, and Irrawaddy dolphins.

b.    Another Center member, Alejandro Olivera Bonilla, lives in La Paz, Mexico, where he works to protect marine animals from bycatch and delights in seeing marine mammals in their natural habitat. He regularly visits places like Cabo Pulmo, Puerto Adolfo López Mateos on the Gulf of Ulloa, Todos Santos, and the Upper Gulf of California where he looks for marine mammals including gray whales, humpback whales, and various species of dolphins. He plans to continue visiting these areas in the future to observe and attempt to observe whales and dolphins.

c.    Dr. Adam Cruise, another Center member, lives in Cape Town, South Africa. He is a wildlife journalist with a longstanding interest in wildlife and conservation. He lives near the water and typically goes to False Bay about three times a week where he looks for and enjoys seeing marine mammals including bottlenose dolphins, harbor porpoises, Cape fur seals, Indian Ocean humpback dolphins, southern right whales, and humpback whales; he has also seen Heaviside's dolphins that inhabit Table Bay on the other side of Cape Town. Dr. Cruise also regularly visits other parts of South Africa's west coast, including West Coast National Park, Langebaan, Paternoster,

Yzerfontein, Lamberts Bay, and Port Nolloth either to vacation or report on various stories and looks for and has seen seals, dolphins, and whales on these trips. He plans to continue making these trips and looking for marine mammals in the future.

d.   Center member Dr. Alexander Hearn lives in Quito, Ecuador. He is a Professor and Researcher at the School of Biological and Environmental Sciences at Universidad San Francisco de Quito with a focus in marine biology and frequently visits Ecuador's coastlines and regularly seeks to view marine mammals in Ecuador's waters for both work and pleasure. He frequently goes to the Galapagos Islands where he looks for and studies Bryde's whales, sperm whales, pilot whales, humpback whales, bottlenose dolphins, Galapagos fur seals, and sea lions. He also regularly visits near Manta and the Gulf of Guayaquil, where he looks for and sees dolphins, humpback whales, and Bryde's whales. Dr. Hearn plans to continue taking these trips and looking for and studying marine mammals into the future.

27.   Entanglement, injury, and death of marine mammals in gillnet fisheries makes it less likely that these and other Center members will continue to view and enjoy marine mammals in the wild. The Center's members' interests have

been, currently are, and will continue to be directly, adversely, and irreparably affected by Defendants' violations of the law.

28.    Plaintiff Animal Welfare Institute ("AWI") is a nonprofit organization with its principal place of business in Washington, D.C. AWI has more than 160,000 members and supporters. Since its founding in 1951, AWI's mission has been to alleviate human-inflicted animal suffering and exploitation by vigorously defending animals' interests through advocacy, research, education and engagement with key stakeholders. AWI engages policymakers, scientists, industry professionals, non-governmental organizations, and the public in fulfilling its mission. AWI advocates for the protection and welfare of marine wildlife, including marine mammals, in the United States and throughout the world. AWI promotes increased protections of marine mammals from unsustainable fishing practices around the globe, especially those practices that cause death due to entanglement in fishing gear. AWI regularly prepares and issues fact sheets, peer-reviewed and policy papers, and news alerts to educate its members and online activists about marine wildlife and the threats they face; monitors legislation and research activities that may affect the well-being of marine mammals; and briefs members of Congress and their staff about agency actions, legislation, international developments, and other activities that bear on these issues. AWI members strongly desire increased protections for imperiled marine wildlife to increase the likelihood of species recovery. AWI members purchase and consume or seek to purchase and consume fish caught with minimal impacts to marine mammals.

29.    AWI members strongly desire increased protections for marine mammals and their habitats in order to increase the likelihood of species recovery and protection. AWI members purchase and consume or seek to purchase and consume fish caught with minimal impacts to marine mammals. AWI members live near and regularly travel to locations along the coast of South Korea, Indonesia, and France, where they delight in the continued existence of marine mammals, advocate for imperiled species of marine mammals, and have specific plans to return in hopes of observing marine mammals in their natural habitat. These interests have been, currently are, and will continue to be directly, adversely, and irreparably affected by Defendants' violations of the law.

    a.    For example, AWI member Hwang Hyun Jin lives in Jeju-do, Republic of Korea (South Korea), and is the co-founder and co-chair of Hot Pink Dolphins, a Korean non-governmental organization solely dedicated to marine protection. Due to her location, she visits dolphin habitat and sees Indo-Pacific bottlenose dolphins almost every day. Since she established her organization's office in Jeju in 2018, she has seen these dolphins more than a thousand times and looks forward to continuing to do so in the future. Hwang Hyun Jin has also observed finless porpoises, having visited their habitat, including South Korea's coastal areas along the Yellow Sea and in the southern sea of the Korean peninsula; she has also seen finless porpoises in the

Dolsan-eup area, where large-scale commercial fishing with nets, including gillnets, is conducted and where finless porpoise bycatch occurs several times per week. During these visits, she observed approximately 50 finless porpoises actively foraging in the coastal area in small groups. She has seen dead finless porpoise bodies washed ashore many times, which decreases her aesthetic enjoyment of seeing these marine mammals in the wild and has made her sad, angry, and determined to continue looking for these marine mammals in the wild and working to protect them from this awful fate. She has also made many visits to Pohang, the Ulsan, and Busan areas, located in the southeastern part of the Korean peninsula, where common minke whales are often found dead due to bycatch; their meat is then traded or sold in the market. Ms. Hyun Jin will continue to visit these areas and monitor this issue in the future.

b.   Similarly, AWI member, Quentin Hoerner is the President and Founder of the French NGO Ambassade des Océans, which seeks to promote the conservation and protection of the world's oceans, seas, and aquatic fauna and flora. On approximately 30 to 40 different occasions, Mr. Hoerner has encountered at least 20 to 25 different marine mammal species around the world, including in the waters off the coasts of France, Norway, Mexico,

the United States, Mauritius, Tunisia, and the Caribbean. Mr. Hoerner lives 18 miles from the shores of the French waters of the English Channel, which is home to many marine mammals including many species taken in bycatch in commercial fisheries. For three months this fall 2024, he will be working on his scuba diving instructor certification there. Mr. Hoerner hopes to observe a variety of marine mammals, such as common dolphins and striped dolphins, blue whales, humpback whales, killer whales, and sperm whales, as well as gray seals and harbor seals. His ability to enjoy these marine mammals in the wild is harmed, and he is upset and frustrated by the knowledge that commercial fisheries active in these waters and the neighboring Bay of Biscay are causing harm to marine mammals. He even feels the need to avoid diving in the Bay of Biscay due to the density of commercial fishing taking place there. Mr. Hoerner is concerned that both the number of animals and type of species harmed and killed, particularly small cetaceans, is increasing, in part because of bycatch in gillnets.

c.    Another AWI member, Scarlett Adler, has traveled from her home in New York to Indonesia several times over the past five years, including an eight-month stay approximately five years ago. During each of her trips, she visited different beaches,

boated around the islands, snorkeled, and participated in other ocean and coastal-based activities around Bali, Gili, Nusa Penida, Flores, and Sulawesi. While on these excursions, Ms. Adler was thrilled to observe marine mammals, including various whales and dolphins, on at least a dozen different occasions. For example, she observed dolphins, whales, and manta rays near Komodo island, where a number of different cetacean species, including blue whales, spinner and bottlenose dolphins, as well as dugongs can be found. While visiting the waters of Sulawesi, she also witnessed fishing taking place in a Marine Protected Area. She is saddened and discouraged to know how bycatch in gillnets is harming and killing marine mammals around Indonesia; this knowledge decreases her enjoyment of the area. She has plans to visit again in November 2024 and during the spring/summer 2025 and will go to the beach and out on the water again to look for marine mammals.

30.    Entanglement, injury, and death of marine mammals in gillnet fisheries makes it less likely that these and other AWI members will continue to view and enjoy marine mammals in the wild. AWI's members' interests have been, currently are, and will continue to be directly, adversely, and irreparably affected by Defendants' violations of the law.

31.    Additionally, Defendants' November 2023 rule delaying the effective date of the Final Import Rule's implementation of the import ban to at least January 2026 without advanced public notice and comment precluded Plaintiffs and their members from commenting on that rule. Had Defendants issued the rule for notice and comment, Plaintiffs would have opposed the extension and would have requested that if Defendants extended the Final Import Rule's effective date, that Defendants ban the importation of fish or fish products that do not meet the requirements of the MMPA, including from the countries listed herein.

32.    Defendants' failure to comply with the APA and MMPA are causing the Plaintiffs' members' injuries, and Plaintiffs' members' injuries are likely to be redressed by the relief requested in this complaint.

33.    The United States is the world's largest importer of seafood by volume, importing more than $25 billion dollars' worth of seafood a year since 2017, and $30.4 billion in 2022. The profitability of selling fish and fish products in the U.S. market makes it likely that foreign nations would comply with U.S. requirements, if implemented by Defendants, in an effort to obtain or maintain access to the U.S. market.

34.    Canada, Ecuador, India, Indonesia, and Mexico are among the top exporters of seafood to the United States.

35.    Numerous nations applied for a comparability finding from NMFS, demonstrating their interest in maintaining exports to the lucrative U.S. market. As NMFS acknowledges on its website, as one of the top importers of seafood, "U.S.

standards for seafood products have a major impact on the sustainability of the world's global seafood trade." *Sustainable Seafood: Seafood Communities*, https://www.fisheries.noaa.gov/topic/sustainable-seafood/seafood-communities (last visited August 5, 2024).

### Defendants

36.    Defendant Gina Raimondo is the Secretary of Commerce and directs all business of the United States Department of Commerce ("Commerce"). Commerce oversees NMFS's compliance with the MMPA and is responsible for implementing the MMPA, including portions of §§ 101(a)(2) and 102(c)(3). Therefore, Commerce and Secretary Raimondo in her official capacity are responsible for violations alleged in this Complaint.

37.    Defendant Janet Coit is the Assistant Administrator of NMFS. Commerce has delegated responsibility for implementing the MMPA to NMFS, including implementation of §§ 101(a)(2) and 102(c)(3). Therefore, NMFS and Assistant Administrator Coit in her official capacity are responsible for the violations alleged in this Complaint.

38.    Defendant Janet Yellen is the Secretary of the Treasury and directs all business of the United States Department of the Treasury ("Treasury"). Section 101(a)(2) of the MMPA directs Treasury to ban the importation of commercial fish and fish products that do not meet U.S. standards for protection of marine mammals. Therefore, Treasury and Secretary Yellen in her official capacity are responsible for the violations alleged in this Complaint.

39.    Defendant Alejandro Mayorkas is the Secretary of Homeland Security and directs all business of the United States Department of Homeland Security ("Homeland Security"). Treasury has partially delegated its authority related to trade bans to Homeland Security, pursuant to the Homeland Security Act. 6 U.S.C. §§ 203(a), 212(a)(1); 68 Fed. Reg. 28,322 (May 23, 2003). Therefore, Homeland Security and Secretary Mayorkas in his official capacity are responsible for the violations alleged in this Complaint.

## Legal Background

### Marine Mammal Protection Act

40.    Public outcry over bycatch of dolphins and porpoises in commercial fishing gear was a major driving force behind the enactment of the MMPA.

41.    The MMPA generally prohibits the "take" of marine mammals, which is defined as "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." 16 U.S.C. §§ 1371(a)(2) (establishing a moratorium on take of marine mammals with limited exemptions), 1372(a)(2) (same), 1362(13) (defining take).

42.    To address take in commercial fisheries, Congress prescribed an "immediate goal that the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations be reduced to insignificant levels approaching a zero mortality and serious injury rate." *Id*. § 1371(a)(2); *see also id*. § 1387(b) ("[T]he Secretary shall review the progress of all commercial fisheries" toward the "[z]ero mortality rate goal" and "take appropriate action.").

43.    To achieve this goal, the MMPA contains specific standards for tracking, assessing, and limiting marine mammal bycatch in domestic fisheries and foreign fisheries that export their products to the United States. *Id.* §§ 1371(a)(2), 1372(c)(3), 1386-1387. Some specific measures include:

a.    **Stock Assessments**. The MMPA requires NMFS to prepare a "stock assessment" for each marine mammal population in U.S. waters, which includes, among other requirements, a report of the population's abundance, the current population trend, the fisheries that interact with the population, the level of "mortality and serious injury"[1] caused by those fisheries each year, and whether the mortality from commercial fisheries is "insignificant and is approaching a zero mortality and serious injury rate." *Id.* § 1386(a).

b.    **Potential Biological Removal**. The MMPA requires calculation of the "potential biological removal" ("PBR") level for each marine mammal stock which occurs in waters under U.S. jurisdiction. *Id.* PBR is the "maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." *Id.* § 1362(20).

---

[1] NMFS defines "serious injury" as "any injury that will likely result in mortality." 50 C.F.R. § 229.2.

Optimum sustainable population refers to "a population size which falls within a range from the population level of a given species or stock which is the largest supportable within the ecosystem to the population level that results in maximum net productivity. Maximum net productivity is the greatest net annual increment in population numbers or biomass resulting from additions to the population due to reproduction and/or growth less losses due to natural mortality." 50 C.F.R. § 216.3. The statute provides a specific formula for calculating PBR, the principal goal of which is ensuring that human-caused mortality is below a level that could lead to stock depletion. *See* 16 U.S.C. § 1362(20).

c.  **Take Reduction Plans**. If direct human-caused mortality exceeds a stock's PBR or the species is listed (or is likely to be listed) as threatened or endangered under the Endangered Species Act, the MMPA requires the development and implementation of a "take reduction plan." *Id.* §§ 1387(f); 1362(19). The plan's immediate goal shall be to reduce fishery-related mortality and serious injury below the PBR within six months, and the long-term goal shall be to reduce bycatch to "insignificant levels approaching a zero mortality and serious injury rate" within five years. *Id.* NMFS has defined

"insignificant" levels of bycatch as at or below 10% of a given marine mammal stock's PBR. Final Import Rule, 81 Fed. Reg. at 54,401.

    d.   **Monitor and Estimate Bycatch Provision**. The MMPA also requires NMFS to establish "a program to monitor incidental mortality and serious injury of marine mammals during the course of commercial fishing operations" to "obtain statistically reliable estimates" of bycatch. 16 U.S.C.§ 1387(d). This may be achieved by placing human observers aboard fishing vessels to record, among other things, marine mammal sightings and the number of marine mammals killed or seriously injured during the fishing operations. *Id.*

44. The MMPA further strictly prohibits "the intentional lethal take of any marine mammal in the course of commercial fishing operations," unless for self-defense or to save a person from immediate danger. 16 U.S.C. §§ 1387(a)(5), 1371(c).

45. The MMPA requires that the "Secretary of the Treasury *shall* ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." *Id.* § 1371(a)(2) (emphasis added).

46. To ensure compliance with this mandate, the "Secretary [of Commerce] shall insist on reasonable proof from the government of any nation from which fish

or fish products will be exported to the United States of the effects on ocean mammals of the commercial fishing technology in use for such fish or fish products exported from such nation to the United States . . ." *Id.*

47.    Additionally, no fish may be imported into the United States "if such fish was caught in a manner which the Secretary has proscribed for persons subject to the jurisdiction of the United States." *Id.* § 1372(c)(3).

48.    With a single exception for dolphins caught in yellowfin tuna purse seine nets in the Eastern Tropical Pacific, the U.S. government did not implement the MMPA's import ban from the time of the MMPA's passage in 1972 through 2016.

49.    In response to a 2008 petition for rulemaking by the Center, NMFS promulgated a regulation in 2016 concerning the importation of fish and fish products from foreign fisheries. Final Import Rule, 81 Fed. Reg. at 54,390. The Final Import Rule "establish[es] procedures and conditions for evaluating a harvesting nation's regulatory program addressing marine mammal incidental mortality and serious injury in its export fisheries, to determine whether it is comparable in effectiveness to the U.S. regulatory program." *Id.* at 54,390-54,391. The Final Import Rule also "addresses intentional mortality and serious injury in fisheries that export to the United States." *Id.*

50.    Under the Final Import Rule, fish and fish products cannot be imported into the United States unless the foreign nation that harvested the fish

has "applied for and received a comparability finding" from NMFS for that fishery. *Id.* (codified at 50 C.F.R. § 216.24(h)(1)).

51.    Specifically, the Final Import Rule prohibits the importation of fish and fish products "caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of U.S. standards" or "caught in a manner which the Secretary has proscribed for persons subject to the jurisdiction of the United States[.]" 50 C.F.R. § 216.24(h)(1)(i).

52.    The Final Import Rule deems any fish or fish product harvested in a foreign fishery "for which a valid comparability finding is not in effect" to be "caught with commercial fishing technology which results in the incidental mortality or incidental serious injury of marine mammals in excess of U.S. standards." *Id.*

53.    The Final Import Rule states that, upon the effective date of the Import Rule's ban on imports from foreign fisheries that do not meet U.S. standards, "it [will be] unlawful for any person to import, or attempt to import, into the United States for commercial purposes any fish or fish product if such fish or fish product . . . [w]as caught or harvested in a fishery that does not have a valid comparability finding in effect at the time of import[.]" *Id.* § 216.24(h)(1)(ii).

54.    The Final Import Rule provides that the import prohibition set forth within the Rule "shall not apply during the exemption period." 50 C.F.R. § 216.24(h)(2)(ii). In the 2016 rule, NMFS defined this "exemption period" as "***a one-time only***" five-year period to afford foreign nations additional time to assess marine mammal stocks, estimate bycatch, and develop regulatory programs to

mitigate that bycatch, so as to attain a comparability finding. Final Import Rule, 81 Fed. Reg. at 54,391 (emphasis added).

55.    Under the Final Import Rule, nations' comparability applications were originally due by March 1, 2021, and NMFS's comparability determinations on those applications were due by November 30, 2021.

56.    On November 3, 2020, NMFS issued an interim final rule that extended the exemption period for one year, so that NMFS's comparability determinations would be due November 30, 2022. 85 Fed. Reg. 69,515 [hereinafter "First Extension Rule"].

57.    Under the First Extension Rule, NMFS also extended the comparability application deadline to November 30, 2021, to provide countries with additional time to achieve compliance in light of global disruptions caused by the COVID-19 pandemic. NMFS stated that it "[found] good cause to issue this interim final rule to extend the exemption period and revise the deadline for applications without advance notice in a proposed rule or the prior opportunity for public comment, and to make the rule effective immediately without providing a 30-day delay, because of the need to provide exporting nations with sufficient advance notice of the additional time to submit their comparability finding applications." *Id.* at 69,516.

58.    On October 21, 2022, NMFS issued a final rule that again extended the exemption period by another year, this time to give NMFS additional time to complete its assessment of the applications for comparability findings. 87 Fed. Reg.

63,955 (Oct. 21, 2022) [hereinafter "Second Extension Rule"]. This created a deadline of November 30, 2023, for NMFS to "determine whether to issue" comparability findings. 50 C.F.R. § 216.24(h)(6)(ii). NMFS issued the rule without a 30-day delay in effective date, citing 5 U.S.C. § 553(d)(3) and claiming that such delay "would not serve the purposes of the extension and would be contrary to the public interest in avoiding confusion about near term deadlines faced by exporting nations." Second Extension Rule, 87 Fed. Reg. at 63,957.

59.    On November 17, 2023, NMFS issued itself yet another extension—this time for two years—again without any notice or opportunity for public comment, such that NMFS has until November 30, 2025, to issue comparability findings and the exemption period will continue until December 31, 2025. Modification of Deadlines Under the Fish and Fish Product Import Provisions of the MMPA, 88 Fed. Reg. 80,193 (Nov. 17, 2023) [hereinafter "Third Extension Rule"]. NMFS "determined that additional time is necessary to complete the evaluation process, given the large number of foreign fisheries, the evolving nature of fisheries data, and the practical challenges of assessing the comparability of the regulatory programs in foreign countries." *Id.* at 80,194.

60.    NMFS has stated it may find "a need to further extend the exemption period or otherwise amend the 2016 final rule." *Id.*

61.    NMFS claimed that the Third Extension Rule was not subject to the Administrative Procedure Act's requirements of advanced notice and prior opportunity for public comment, or a 30-day delay in effectiveness, "because it

involves a 'foreign affairs function of the United States' under 5 U.S.C. § 553(a)(1)." *Id.* at 80,194. NMFS further claimed that the Third Extension Rule was additionally not subject to the 30-day delay in effectiveness pursuant to 5 U.S.C. § 553(d)(1), because "it 'relieves a restriction.'" *Id.*

62.    Because of these extensions to the exemption period, NMFS has issued only two comparability findings under its Final Import Rule since the Rule was issued in 2016. NMFS issued and then revoked a comparability finding for Mexican fisheries affecting the vaquita while litigation on the issue was pending before this Court. 85 Fed. Reg. 13,626 (Mar. 9, 2020). NMFS also issued a comparability finding for New Zealand fisheries that overlap with the habitat of the critically endangered Maui dolphin. Litigation concerning the New Zealand comparability finding is ongoing before this Court. *See Sea Shepherd New Zealand et al. v. Ross et al.*, Case No. 1:20-cv-00112-GSK (CIT).

63.    To determine comparability under the Final Import Rule, NMFS must examine whether the harvesting nation maintains a regulatory program that either includes, or effectively achieves the same results as, the conditions specified in 216.24(h)(6)(iii) of the Rule—which NMFS describes as "features of the U.S. regulatory program"—subject to additional considerations in (h)(7) of the rule. Final Import Rule, 81 Fed. Reg. at 54,391-92.

64.    The Final Import Rule "establishes procedures and conditions for evaluating a harvesting nation's regulatory program addressing marine mammal incidental mortality and serious injury in its export fisheries, to determine whether

it is comparable in effectiveness to the U.S. regulatory program." *Final Import Rule*, 81 Fed. Reg. at 54,390. The Final Import Rule also addresses intentional mortality and serious injury in the course of commercial fishing operations. *Id.* at 54,390-54,391.

65.    To qualify for a comparability finding enabling it to export fish and fish products to the United States, a harvesting nation must first "prohibit[] the intentional mortality or serious injury of marine mammals in the course of commercial fishing operations," except when such action is imminently necessary for self-defense or to save the life of a person in immediate danger. 50 C.F.R. § 216.24(h)(6)(iii)(A)(1) (implementing MMPA § 102(c)(3)).

66.    If it does not prohibit such intentional harm to marine mammals in the course of commercial fishing, the United States may only import fish and fish products from a foreign fishery if that foreign nation "demonstrates that it has procedures to reliably certify that exports of fish and fish products to the United States are not the product of an intentional killing or serious injury of a marine mammal," absent an instance of self-defense or human life-saving. 50 C.F.R. § 216.24(h)(6)(iii)(A)(2) (implementing MMPA § 102(c)(3)).

67.    NMFS has stated that compliance with MMPA § 102(c)(3), as implemented by 50 C.F.R. § 216.24(h)(6)(iii)(A), requires harvesting nations to "either institut[e] a law, regulation, or licensure or permit condition applicable to its export and exempt fisheries that prohibits the intentional killing or serious injury of marine mammals in the course of commercial fishing operations" or "submit

documentary evidence demonstrating that it has procedures to reliably certify that its exports of fish and fish products to the United States are not the product of the intentional killing or serious injury of marine mammals." Final Import Rule, 81 Fed. Reg. at 54,400. NMFS further stated that it expects such procedures would include certification programs, tracking and verification schemes, and chain of custody information. *Id.*

68.    In addition to assessing the condition on intentional mortality, the Final Import Rule provides that NMFS "shall" determine whether the harvesting nation operating in its own Exclusive Economic Zone maintains a regulatory program that provides for, or effectively achieves comparable results as, the following:

a.    **Marine mammal assessments.** The nation must estimate the population abundance of marine mammal stocks in waters under its jurisdiction that are incidentally killed or seriously injured by its export fisheries. 50 C.F.R. § 216.24(h)(6)(iii)(C)(*1*).

b.    **Fishery Register.** The nation must maintain an export fishery register that contains a list of all fishing vessels participating in an export fishery, including information on the number of vessels participating, the time or season and area of operation, gear type and target species. 50 C.F.R. § 216.24(h)(6)(iii)(C)(*2*).

c.    **Regulatory Requirements to Report and Mitigate Bycatch.** The nation must have regulatory requirements:

(i) that "the owner or operator of a vessel participating in an export fishery report all intentional and incidental mortality and injury of marine mammals in the course of commercial fishing operations," and (ii) "to implement measures in the export fishery designed to reduce the total incidental mortality and serious injury of a marine mammal stock below the bycatch limit." 50 C.F.R. § 216.24(h)(6)(iii)(C)(*3*)(i)-(ii).

d.    **Monitoring procedures.** The nation must require implementation of monitoring procedures in its export fisheries that are "designed to estimate incidental mortality or serious injury in the export fishery, and to estimate the cumulative incidental mortality and serious injury of marine mammal stocks in waters under its jurisdiction resulting from the export fishery and other export fisheries interacting with the same marine mammal stocks, including an indication of the statistical reliability of those estimates." 50 C.F.R. § 216.24(h)(6)(iii)(C)(*4*).

e.    **Calculation of Bycatch Limits.** The nation's regulatory program must provide for the calculation of bycatch limits for marine mammal stocks in waters under its jurisdiction that are

incidentally killed or seriously injured in the export fishery. 50
C.F.R. § 216.24(h)(6)(iii)(C)(*5*).

    f.    **Demonstration Bycatch is Below Bycatch Limits.** The
nation must compare the incidental mortality and serious injury
of each marine mammal stock that interacts with its export
fisheries in relation to the bycatch limit for each stock and
demonstrate that the export fishery whose products it seeks to
export to the United States either (i) does not exceed the bycatch
limit for any marine mammal stock with which it interacts, or
(ii) does contribute to the cumulative incidental mortality and
serious injury exceeding a particular stock's bycatch limit, but
would not if all other export fisheries interacting with the same
marine mammal stock or stocks had the same level of bycatch.
50 C.F.R. § 216.24(h)(6)(iii)(C)(*6*).

69.    The Final Import Rule provides that, in determining whether to issue
a comparability finding for a harvesting nation's export fishery, NMFS must also
take into account "additional considerations" including: (i) U.S. implementation of
its regulatory program for similar marine mammal stocks and similar fisheries
(considering gear or target species); (ii) the "extent to which the harvesting nation
has successfully implemented measures in the export fishery to reduce the
incidental mortality and serious injury of marine mammals caused by the
harvesting nation's export fisheries to levels below the bycatch limit"; (iii) whether

the measures adopted by the nation for its export fishery "have reduced or will likely reduce" the cumulative incidental mortality and serious injury of each marine mammal stock below the bycatch limit, and "the progress of the regulatory program toward achieving its objectives"; and (iv) "other relevant facts and circumstances," such as the history and nature of interactions with marine mammals in a particular export fishery, the population size and trend of the marine mammal stock, the population level impacts of the incidental mortality or serious injury of marine mammals from a harvesting nation's export fisheries, and the conservation status of the affected marine mammal stocks where available. 50 C.F.R. § 216.24(h)(7)(i)-(iv).

### Administrative Procedure Act

70.    Section 702 of the APA provides a cause of action to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.

71.    An "agency action" is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

72.    Courts must "hold unlawful or set aside" an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

73.     Under the APA, courts shall also "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). This provision applies to all

discrete actions an agency is required to take. *Natural Resources Defense Council, Inc. v. Ross*, 331 F. Supp. 3d 1338, 1353 (Ct. Int'l Trade 2018) (citing *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004)).

74.    Administrative rules with the "force and effect of law," may only be promulgated after public notice and comment in conformity with the procedures set forth in the APA. *INS v. Chadha,* 462 U.S. 919, 986 n. 19 (1983); *Appalachian Power Co.*, 208 F.3d 1015, 1020 (D.C. Cir. 2000) (citing 5 U.S.C. § 553).

75.    The APA further requires that such rules with the "force and effect of law" be promulgated subject to a 30-day delay in effectiveness. 5 U.S.C. § 553(d).

## Factual Background

76.    Congress has instructed NMFS, among other agencies and departments, to ban certain fish and fish products that do not comply with U.S. standards for bycatch, but the Defendants have "unreasonably delayed and unlawfully withheld" action that would fulfill their statutory obligations.

77.    With limited exceptions, the federal government has failed to ban the importation of fish or fish products from fisheries that are not meeting U.S. bycatch standards since 1972.

78.    Most recently, NMFS and the other agencies named herein failed to observe the procedures required by law, including by promulgating a two-year extension for determining which nations' fisheries do not meet U.S. standards and delaying implementation of the statutory import bans until January 1, 2026 without the advanced notice and comment required by 5 U.S.C. §§ 553(b)-(d), as

well as the requirement to publish a substantive rule not less than 30 days before its effective date.

79.    As noted above, bycatch is a global problem responsible for the death of likely over 650,000 marine mammals each year.

80.    Bycatch is the predominant threat to marine mammals globally.

81.    Certain types of commercial fishing gear pose significant risks of death to marine mammals. NMFS has recognized that fisheries exporting fish caught with certain types of gear, including gillnets, longlines, trawls, traps/pots, and purse seines are linked to bycatch. Proposed Import Rule, 80 Fed. Reg. at 48,176.

82.    Gillnets are particularly perilous for marine mammals. Gillnets are walls of netting designed to hang vertically in the water column and allow only the head of a fish to pass through. When the fish attempts to back out of the net, it becomes entangled and the fish is caught. However, gillnets are non-selective, and as they hang in the water column for hours—or even days—at a time, they incidentally capture a vast array of non-target marine life including marine mammals. Because marine mammals need to surface to breathe, they often drown after becoming entangled in gillnets.

83.    The United States, as the world's leading seafood-importing nation, sources substantial amounts of seafood from nations around the world.

84.    Many nations from which the United States currently imports fish and fish product allow the indiscriminate use of gillnets, to the detriment of marine mammal populations that inhabit the waters in which those fisheries operate. Yet,

upon information and belief, many nations with commercial fisheries that utilize gillnets failed to submit bycatch estimates for those fisheries in their application for a comparability finding.

85.    Despite nations' failure to submit this most basic information regarding the effects of their fisheries on marine mammals, NMFS has failed to ban seafood imports, including, without limitation, from the fisheries listed in paragraphs 86 to 129, all of which export seafood to the United States, and did not provide reasonable proof of the "effects on ocean mammals" of the gear used, posing a significant threat to marine mammal populations.

### *Canada*

86.    Canada exports fish and fish products to the United States from fisheries that use gillnets, including: (i) the Atlantic Northwest herring and sardine fishery; (ii) the Atlantic Northwest and Quebec mackerel gillnet fishery; and (iii) the Atlantic Northwest and Newfoundland/Labrador smelt fishery.

87.    Multiple marine mammal populations inhabit the waters in which these Canadian fisheries operate and may be at risk from fishing operations, including populations of blue whale, bottlenose dolphin, common dolphin, common minke whale, false killer whale, fin whale, gray seal, gray whale, harbor porpoise, harbor seal, harp seal, hooded seal, humpback whale, killer whale, Risso's dolphin, sei whale, short-finned pilot whale, sperm whale, striped dolphin, and white-beaked dolphin.

88.    On information and belief, Canada has not reported marine mammal bycatch data for the gillnet fisheries listed above.

89.    NMFS has not determined that the use of gillnets in these fisheries does not "result[] in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." 16 U.S.C. §§ 1371(a)(2), 1371(a)(2)(A). On information and belief, bycatch of marine mammals in these fisheries exceeds U.S. standards.

90.    The U.S. government has not banned the importation of herring, sardine, mackerel, and smelt from the Canadian gillnet fisheries listed above.

### *Ecuador*

91.    Ecuador exports fish and fish products to the United States from fisheries that use gillnets, including: (i) its Exclusive Economic Zone ("EEZ") gillnet fishery for bigeye tuna, yellowfin tuna, black skipjack tuna, Pacific sailfish, sierra, escolar, swordfish, marlin, striped marlin, dolphinfish, and wahoo; and (ii) its coastal artisanal surface gillnet fisheries targeting large pelagic finfish in the Gulf of Guayaquil.

92.    Multiple marine mammal populations inhabit the waters in which these Ecuadorian fisheries operate and may be at risk from fishing operations, including populations of blue whale, bottlenose dolphin, Bryde's whale, common dolphin, Eastern spinner dolphin, false killer whale, Galapagos fur seal, Galapagos sea lion, humpback whale, pantropical spotted dolphin, Risso's dolphin, short-finned pilot whale, sperm whale, and striped dolphin.

93.     On information and belief, Ecuador has not reported marine mammal bycatch data for the gillnet fisheries listed above.

94.     NMFS has not determined that the use of gillnets in these fisheries does not "result[] in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." 16 U.S.C. §§ 1371(a)(2), 1371(a)(2)(A). On information and belief, bycatch of marine mammals in these fisheries exceeds U.S. standards.

95.     The U.S. government has not banned the importation of bigeye tuna, yellowfin tuna, black skipjack tuna, Pacific sailfish, sierra, escolar, swordfish, marlin, striped marlin, dolphinfish, wahoo, and any other fish from the Ecuadorian gillnet fisheries listed above.

### *France*

96.     France exports fish and fish products to the United States from fisheries that use gillnets, including from its: (i) Atlantic cod and mackerel gillnet fisheries; (ii) Northeast Atlantic sardine and crab gillnet fisheries; (iii) mainland EEZ and high seas albacore tuna gillnet fishery; and (iv) North Sea, Irish Sea Channel, and Northeast Atlantic monkfish, seabass, and sole fishery.

97.     Multiple marine mammal populations inhabit the waters in which these French fisheries operate and may be at risk from fishing operations, including populations of Atlantic white-sided dolphin, blue whale, bottlenose dolphin, common minke whale, fin whale, gray seal, harbor seal, humpback whale, killer whale, long-

finned pilot whale, Risso's dolphin, sperm whale, striped dolphin, and white-beaked dolphin.

98.     On information and belief, France has not reported marine mammal bycatch data for the gillnet fisheries listed above.

99.     NMFS has not determined that the use of gillnets in these fisheries does not "result[] in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." 16 U.S.C. §§ 1371(a)(2), 1371(a)(2)(A). On information and belief, bycatch of marine mammals in these fisheries exceeds U.S. standards.

100.     The U.S. government has not banned the importation of cod, mackerel, sardine, crab, albacore tuna, monkfish, seabass, and sole from the French gillnet fisheries listed above.

### *India*

101.     India exports fish and fish products to the United States from fisheries that use gillnets, including from its: (i) grouper and snapper gillnet fishery; (ii) yellowfin tuna and shark gillnet fishery; (iii) pelagic and demersal gillnet fishery for rays and skates; and (iv) pelagic gillnet fishery for herring, sardines, rays, skates, mullet, mackerel, carangid, pompanos, tuna, silver pomfret, and other finfish.

102.     Multiple marine mammal populations inhabit the waters in which these fisheries operate and may be at risk from fishing operations, including populations of blue whale, Bryde's whale, dugong, dwarf spinner dolphin, false killer whale, Gray's spinner dolphin, humpback whale, Indian Ocean humpback

dolphin, Indo-Pacific common dolphin, Indo-Pacific finless porpoise, Indo-Pacific humpback dolphin, pantropical spotted dolphin, Risso's dolphin, short-finned pilot whale, sperm whale, and striped dolphin.

103.    On information and belief, India has not reported marine mammal bycatch data for the gillnet fisheries listed above.

104.    NMFS has not determined that the use of gillnets in these fisheries does not "result[] in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." 16 U.S.C. §§ 1371(a)(2), 1371(a)(2)(A). On information and belief, bycatch of marine mammals in these fisheries exceeds U.S. standards.

105.    The U.S. government has not banned the importation of grouper, snapper, yellowfin tuna, other species of tuna, shark, rays, skates, herring, sardines, mullet, mackerel, carangid, pompanos, silver pomfret, and other finfish from the Indian gillnet fisheries listed above.

### *Indonesia*

106.    Indonesia exports fish and fish products to the United States from fisheries that use gillnets, including from its: (i) coastal swimming blue crab gillnet fishery; (ii) Eastern Indian Ocean and Western Central Pacific grouper and snapper gillnet fishery; and (iii) Eastern Indian Ocean and Western Central Pacific marine finfish gillnet fishery.

107.    Multiple marine mammal populations inhabit the waters in which these fisheries operate and may be at risk from fishing operations, including

populations of blue whale, Bryde's whale, common minke whale, dugong, dwarf spinner dolphin, false killer whale, fin whale, humpback whale, Indo-Pacific bottlenose dolphin, Indo-Pacific common dolphin, Indo-Pacific finless porpoise, Indo-Pacific humpback dolphin, Irrawaddy dolphin, pantropical spotted dolphin, pygmy blue whale, Risso's dolphin, short-finned pilot whale, sperm whale, and striped dolphin.

108.    On information and belief, Indonesia has not reported marine mammal bycatch data for the gillnet fisheries listed above.

109.    NMFS has not determined that the use of gillnets in these fisheries does not "result[] in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." 16 U.S.C. §§ 1371(a)(2), 1371(a)(2)(A). On information and belief, bycatch of marine mammals in these fisheries exceeds U.S. standards.

110.    The U.S. government has not banned the importation of swimming blue crab, grouper, snapper, and other finfish from the Indonesian gillnet fisheries listed above.

### *Mexico*

111.    Mexico exports fish and fish products to the United States from fisheries that use gillnets, including from its: (i) Atlantic Western Central and Gulf of Mexico cobia fishery; (ii) Pacific Eastern Central halibut, whitefish, turbot, flatfish, and sole demersal gillnet fishery; (iii) Pacific Eastern Central and West Coast of Baja Peninsula sole, weakfish (Gulf, Orangemouth, and shortfin), and

barred sand bass demersal gillnet fishery; (iv) EEZ weakfish (Gulf, Orangemouth, and shortfin) gillnet fishery; (v) Gulf of Mexico deepwater red snapper gillnet fishery; and (vi) EEZ and Gulf of Mexico gillnet fishery for various sharks.

112.    Multiple marine mammal populations inhabit the waters in which these Mexican fisheries operate and may be at risk from fishing operations, including populations of Antillean manatee, blue whale, bottlenose dolphin, Bryde's whale, California sea lion, common dolphin, common minke whale, Eastern spinner dolphin, false killer whale, fin whale, gray whale, humpback whale, killer whale, pantropical spotted dolphin, Risso's dolphin, sei whale, short-finned pilot whale, sperm whale, and striped dolphin.

113.    On information and belief, Mexico has not reported marine mammal bycatch data for the gillnet fisheries listed above.

114.    NMFS has not determined that the use of gillnets in these fisheries does not "result[] in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." 16 U.S.C. §§ 1371(a)(2), 1371(a)(2)(A). On information and belief, bycatch of marine mammals in these fisheries exceeds U.S. standards.

115.    The U.S. government has not banned the importation of cobia, halibut, whitefish, turbot, flatfish, sole, weakfish (Gulf, Orangemouth, and shortfin), barred sand bass, deepwater red snapper, and sharks from the Mexican gillnet fisheries listed above, with the exception of certain fisheries in the Upper Gulf of California that overlap with the habitat of the critically endangered vaquita.

### *South Africa*

116.    South Africa exports fish and fish products to the United States from fisheries that use gillnets, including its EEZ gillnet mullet fishery.

117.    Multiple marine mammal populations inhabit the waters in which these South African fisheries operate and may be at risk from fishing operations, including populations of Antarctic blue whale, bottlenose dolphin, Bryde's whale, Indian Ocean humpback dolphin, common dolphin, common minke whale, false killer whale, Gray's spinner dolphin, Heaviside's dolphin, humpback whale, Indo-Pacific bottlenose dolphin, pygmy blue whale, Risso's dolphin, sei whale, short-finned pilot whale, Southern right whale, sperm whale, and striped dolphin.

118.    On information and belief, South Africa has not reported marine mammal bycatch data for the gillnet fisheries listed above.

119.    NMFS has not determined that the use of gillnets in these fisheries does not "result[] in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." 16 U.S.C. §§ 1371(a)(2), 1371(a)(2)(A). On information and belief, bycatch of marine mammals in these fisheries exceeds U.S. standards.

120.    The U.S. government has not banned the importation of mullet from the South African gillnet fishery listed above.

### *United Kingdom*

121.    The United Kingdom ("U.K.") exports fish and fish products to the United States from fisheries that use gillnets, including from its: (i) EEZ and

Northeast Atlantic anchovy, herring, and sardine gillnet fishery and dogfish gillnet fishery; (ii) Atlantic cod fishery and crab (blue, swimming, edible, king, stone, spinous spider, and other crabs) and finfish fishery; (iii) Northeast Atlantic mackerel, European lobster, and other lobster fisheries; and (iv) EEZ, Northeast Atlantic, and Norway herring and sardine fishery.

122.    Multiple marine mammal populations inhabit waters of the Atlantic where these U.K. fisheries operate and may be at risk from fishery operations, including populations of Atlantic white-sided dolphin, bottlenose dolphin, common dolphin, common minke whale, gray seal, harbor porpoise, harbor seal, hooded seal, humpback whale, killer whale, long-finned pilot whale, sei whale, sperm whale, striped dolphin, and white-beaked dolphin.

123.    On information and belief, the U.K. has not reported marine mammal bycatch data for the gillnet fisheries listed above.

124.    NMFS has not determined that the use of gillnets in these fisheries does not "result[] in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." 16 U.S.C. §§ 1371(a)(2), 1371(a)(2)(A). On information and belief, bycatch of marine mammals in these fisheries exceeds U.S. standards.

125.    The U.S. government has not banned the importation of anchovy, herring, sardines, mackerel, dogfish, Atlantic cod, crab (blue, swimming, edible, king, stone, spinous spider, and other crabs) European lobster, and other lobster from the U.K. gillnet fisheries listed above.

*South Korea*

126.    The Republic of Korea ("South Korea") exports fish and fish products to the United States.

127.    Multiple marine mammal populations inhabit the waters under South Korea's jurisdiction, including populations of bottlenose dolphin, common dolphin, common minke whale, Dall's porpoise, false killer whale, fin whale, Western gray whale, harbor porpoise, humpback whale, Indo-Pacific bottlenose dolphin, killer whale, narrow-ridged finless porpoise, North Pacific right whale, northern fur seal, Pacific white-sided dolphin, pantropical spotted dolphin, Risso's dolphin, sei whale, short-finned pilot whale, sperm whale, Stejneger's beaked whale, and striped dolphin.

128.    On information and belief, South Korea does not prohibit the intentional killing or serious injury of marine mammals in the course of commercial fishing operations, nor does it maintain a certification program or tracking and verification scheme that would enable it to "reliably certify" that its exports of fish and fish products to the United States are not the product of the intentional killing or serious injury of marine mammals.

129.    The U.S. government has not banned the importation of fish and fish products from South Korean fisheries.

## Count I
### Violation of the MMPA:
### Failure to Ban Imports as Required by
### Section 101(a)(2) of the MMPA

130.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 to 129.

131.    Section 101(a)(2) of the MMPA provides that Defendants "shall ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." 16 U.S.C. § 1371(a)(2).

132.    Section 101(a)(2) also states that "[f]or purposes of applying the [ban], [Defendants] shall insist on reasonable proof from the government of any nation from which fish or fish products will be exported to the United States of the effects on ocean mammals of the commercial fishing technology in use for such fish or fish products exported from such nation to the United States." *Id.* § 1371(a)(2)(A).

133.    On information and belief, numerous fisheries—including those listed in paragraphs 86 to 129—have not submitted bycatch data to Defendants or otherwise provided "reasonable proof" of the effects of their fisheries on marine mammals or that the incidental killing or incidental serious injury of marine mammals is not "in excess of United States standards." 16 U.S.C. §§ 1371(a)(2), 1371(a)(2)(A).

134.    Defendants have not banned the importation of fish and fish products from those fisheries in violation of Section 101(a)(2) of the MMPA, despite having

not received bycatch data providing reasonable proof of the effects of export
fisheries on marine mammals, or that the incidental killing or incidental serious
injury of ocean mammals is not "in excess of United States standards," and despite
the fact that, on information and belief, bycatch in fisheries from which the United
States continues to import fish and fish products exceeds U.S. standards. *Id.*

135.    An import ban is a discrete, final agency action that can be compelled
under the APA. 5 U.S.C. §§ 704, 706(1).

136.    Defendants' failure to act constitutes "agency action unlawfully
withheld or unreasonably delayed," for which this Court may order relief under the
APA. 5 U.S.C. § 706(1).

## Count II
### Violation of the MMPA:
### Failure to Ban Imports as Required by
### Section 102(c)(3) of the MMPA

137.    Plaintiffs reallege and incorporate by reference the allegations
contained in paragraphs 1 to 129.

138.    The MMPA prohibits "the intentional lethal take of any marine
mammal in the course of commercial fishing operations." 16 U.S.C. §§ 1387(a)(5),
1371(a)(2).

139.    Section 102(c)(3) of the MMPA provides that "[i]t is unlawful to import
into the United States . . . [a]ny fish, whether fresh, frozen, or otherwise prepared, if
such fish was caught in a manner which the Secretary has proscribed for persons
subject to the jurisdiction of the United States, whether or not any marine
mammals were in fact taken incidental to the catching of the fish." 16 U.S.C.

§ 1372(c)(3). Intentional serious injury or mortality in the course of commercial fishery operations is a "manner [of fishing] that the Secretary has proscribed for persons subject to the jurisdiction of the United States." *Id.*

140.   Defendants have not banned the importation of fish and fish products from nations that fail to ban intentional serious injury or mortality in the course of commercial fishery operations for their export fisheries, including certain nations listed in paragraphs 86 to 129 in violation of Section 102(c)(3) of the MMPA. *Id.*

141.   An import ban is a final agency action that can be compelled under the APA. 5 U.S.C. §§ 704, 706(1).

142.   Defendants' failure to act constitutes "agency action unlawfully withheld or unreasonably delayed," for which this Court may order relief under the APA. 5 U.S.C. § 706(1).

### Count III
### Violation of the MMPA:
### Failure to Insist on Reasonable Proof as Required by
### Section 101(a)(2)(A) of the MMPA

143.   Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 to 129.

144.   Section 101(a)(2)(A) of the MMPA provides that Defendants "shall insist on reasonable proof from the government of any nation from which fish or fish products will be exported to the United States of the effects on ocean mammals of the commercial fishing technology in use for such fish or fish products exported from such nation to the United States" for the purpose of determining whether such

technology meets U.S. standards for the protection of marine mammals. 16 U.S.C. § 1371(a)(2)(A).

145.    On information and belief, numerous nations have failed to provide reasonable proof of the effects that fishing gear used in their commercial fisheries is having on marine mammals.

146.    Defendants have failed to insist on reasonable proof from nations of the effects of their export fisheries on marine mammals, in violation of section 101(a)(2)(A) of the MMPA. 16 U.S.C. § 1371(a)(2)(A).

147.    A failure to insist on reasonable proof is a final agency action that can be compelled under the APA. 5 U.S.C. §§ 704, 706(1).

148.    Defendants' failure to act constitutes "agency action unlawfully withheld or unreasonably delayed," for which this Court may order relief under the APA. 5 U.S.C. § 706(1).

## Count IV
### Violation of the APA, 5 U.S.C. § 553(b)-(d)
### Failure to Provide Notice and
### Opportunity to Comment

149.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 to 129.

150.    In 2016, NMFS issued the Final Import Rule, which "establish[es] procedures and conditions for evaluating a harvesting nation's regulatory program addressing marine mammal incidental mortality and serious injury in its export fisheries, to determine whether it is comparable in effectiveness to the U.S. regulatory program." Final Import Rule, 81 Fed. Reg. at 54,390-91.

151.    The Final Import Rule provided that its import prohibition "shall not apply during the exemption period." 50 C.F.R. § 216.24(h)(2)(ii).

152.    In the 2016 rule, NMFS defined this "exemption period" as a "one-time only" five-year period to afford foreign nations additional time to assess marine mammal stocks, estimate bycatch, and develop regulatory programs to mitigate that bycatch, so as to attain a comparability finding. Final Import Rule, 81 Fed. Reg. at 54,391.

153.    Since the promulgation of the Final Import Rule, NMFS has extended this "one-time only" five-year "exemption period" three times, delaying implementation of the statutory ban four additional years.

154.    Most recently, in 2023, NMFS issued a two-year extension for determining which nations' fisheries do not meet U.S. standards, delaying import bans until January 1, 2026, without any public notice and opportunity for public comment. 88 Fed. Reg. 80,193 (Nov. 17, 2023). This violated the APA. *See* 5 U.S.C. § 553(b)-(d).

155.    By delaying the effective date of the Final Import Rule, NMFS engaged in substantive rulemaking.

156.    The APA requires that NMFS provide interested persons notice and an opportunity to comment before promulgating any final rule. 5 U.S.C. § 553(b)-(c). NMFS failed to comply with this requirement.

157.    The APA further requires that publication of a substantive rule shall be made not less than 30 days before its effective date, absent certain (inapplicable) circumstances. *See* 5 U.S.C. § 553(d). NMFS failed to comply with this requirement.

158.    No exceptions to the general requirement for notice and comment concerning rulemaking apply.

159.    Defendants' failure to provide for public notice and comment on the Third Extension Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and made "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

1) Declare that Defendants have unlawfully withheld and unreasonably delayed implementation of MMPA Sections 101(a)(2) and 102(c)(3) by failing to ban the importation of fish and fish products from fisheries in violation of those statutory sections;

2) Declare that Defendants' Third Extension Rule is a substantive rule, and that Defendants failure to provide notice and an opportunity for comment on this substantive rule violates the APA;

3) Vacate the rule issued by NMFS at 88 Fed. Reg. 80,193;

4) Order Defendants to implement the Final Import Rule, including any import prohibitions required by its terms, subject to this Court's oversight, by a date certain;

5)  Enter an injunction requiring Defendants to ban the importation of fish or fish products that do not meet the requirements of the MMPA;

6)  Award Plaintiffs the costs of this action, including reasonable attorney fees; and

7)  Grant any other relief this Court finds just and proper.

Dated: August 8, 2024                    Respectfully submitted,

*/s/ Christina S. Marshall*

Mina S. Makarious
mina@andersonkreiger.com
Christina S. Marshall
cmarshall@andersonkreiger.com
Sean M. Grammel
sgrammel@andersonkreiger.com
Marissa C. Grenon Gutierrez
mgrenongutierrez@andersonkreiger.com
ANDERSON & KREIGER LLP
50 Milk, 21st Floor
Boston, MA 02109
Telephone: 617-621-6500
Fax: 617-621-6660

*Counsel for Natural Resources Defense Council, Center for Biological Diversity and Animal Welfare Institute*

*/s/ Sarah Uhlemann*

Sarah Uhlemann
Center for Biological Diversity
120 State Avenue NE #268
Olympia, WA 98501
(206) 327-2344
suhlemann@biologicaldiversity.org

*Counsel for Center for Biological Diversity and Animal Welfare Institute*

*/s/ Zak Smith*
Zak Smith*
Natural Resources Defense Council
317 East Mendenhall Street
Suites D & E
Bozeman, MT 59715
(406) 556-9300
zsmith@nrdc.org

*Counsel for Natural Resources Defense Council*
\* Application for admission pending