**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., <br><br> CENTER FOR BIOLOGICAL DIVERSITY, <br><br> *and* <br><br> ANIMAL WELFARE INSTITUTE, <br><br>               Plaintiffs, <br><br>               v. <br><br> HOWARD LUTNICK, *in his official capacity as Secretary of Commerce*, <br><br> UNITED STATES DEPARTMENT OF COMMERCE, <br><br> EUGENIO PIÑEIRO SOLER, *in his official capacity as Assistant Administrator of the National Marine Fisheries Service*, <br><br> NATIONAL MARINE FISHERIES SERVICE, <br><br> SCOTT BESSENT, *in his official capacity as Secretary of the Treasury*, <br><br> UNITED STATES DEPARTMENT OF THE TREASURY, <br><br> KRISTI NOEM, *in her official capacity as Secretary of Homeland Security*, <br><br> *and* | Case No. 1:24-cv-00148 |

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,

                    Defendants,

*and*

NATIONAL FISHERIES INSTITUTE, INC.,

RESTAURANT LAW CENTER,

PHILLIPS FOODS, INC.,

HERON POINT SEAFOOD, LLC,

NEWPORT INTERNATIONAL OF TIERRA
VERDE, INC.,

3FISH, INC.,

HANDY SEAFOOD INC.,

SHAW'S SOUTHERN BELLE FROZEN
FOODS, INC.,

SUPREME CRAB & SEAFOOD, INC.,

CEBU PACIFIC LLC,

BYRD INTERNATIONAL INC.,

*and*

CRUSTACEA SEAFOOD COMPANY, INC.

                    Intervenor-Defendants.

**PROPOSED ORDER**

Upon consideration of Plaintiffs' Motion to Enforce Settlement Agreement and the response filed by National Fisheries Institute; Restaurant Law Center; Phillips Foods, Inc.; Heron Point Seafood, LLC; Newport International of Tierra Verde, Inc.; 3Fish, Inc.; Handy Seafood Inc.; Shaw's Southern Belle Frozen Foods, Inc.; Supreme Crab & Seafood, Inc.; Cebu Pacific LLC; Byrd International Inc., and Crustacea Seafood Company, Inc. (collectively, "Intervenor-Defendants"); and upon consideration of all other papers and proceedings, it is hereby,

**ORDERED** that Plaintiffs' Motion to Enforce Settlement Agreement is denied.

**SO ORDERED.**

Dated: _____

New York, New York                                    _____

                                                       JUDGE GARY S. KATZMANN

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., | |
| CENTER FOR BIOLOGICAL DIVERSITY, | |
| *and* | Case No. 1:24-cv-00148 |
| ANIMAL WELFARE INSTITUTE, | Before: Judge Gary S. Katzmann |
| Plaintiffs, | |
| v. | |
| HOWARD LUTNICK, *in his official capacity as Secretary of Commerce*, | |
| UNITED STATES DEPARTMENT OF COMMERCE, | |
| EUGENIO PIÑEIRO SOLER, *in his official capacity as Assistant Administrator of the National Marine Fisheries Service*, | |
| NATIONAL MARINE FISHERIES SERVICE, | |
| SCOTT BESSENT, *in his official capacity as Secretary of the Treasury*, | |
| UNITED STATES DEPARTMENT OF THE TREASURY, | |
| KRISTI NOEM, *in her official capacity as Secretary of Homeland Security*, | |
| *and* | |

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY.

        Defendants,

*and*

NATIONAL FISHERIES INSTITUTE,

RESTAURANT LAW CENTER,

PHILLIPS FOODS, INC.,

HERON POINT SEAFOOD, LLC,

NEWPORT INTERNATIONAL OF TIERRA
VERDE, INC.,

3FISH, INC.,

HANDY SEAFOOD INC.,

SHAW'S SOUTHERN BELLE FROZEN
FOODS, INC.,

SUPREME CRAB & SEAFOOD, INC.,

CEBU PACIFIC LLC,

BYRD INTERNATIONAL INC.,

*and*

CRUSTACEA SEAFOOD COMPANY, INC.

        Intervenor-Defendants.

**NATIONAL FISHERIES INSTITUTE, ET AL.'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AGREEMENT**

## TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ...................................................................................................................... 1

I.  Marine Mammal Protection Act ............................................................................ 1

II.  MMPA Implementing Regulations ....................................................................... 2

III.  The *Lutnick* Agreement ......................................................................................... 4

IV.  The September 2025 Comparability Findings ....................................................... 5

V.  The *NFI* Settlement ............................................................................................... 6

ARGUMENT ........................................................................................................................... 8

I.  The *Lutnick* Agreement Entitled Plaintiffs to a Process, Not an Outcome .............. 8

II.  The *NFI* Order is Compatible with the *Lutnick* Agreement ................................... 11

III.  Each Agency Action is Separate and Must be Judged Under the Administrative Procedure Act and its Own Administrative Record ................................................. 14

CONCLUSION ....................................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967)...........................................................................................10

*Burlington Truck Lines, Inc. v. United States*,
   371 U.S. 156 ......................................................................................................13

*Decatur v. Paulding*,
   39 U.S. 497 (1840).............................................................................................8

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)...........................................................................................14

*Federal Crop Insurance Corp. v. Merrill*,
   332 U.S. 380 (1947)...........................................................................................8

*Inner Mongolia Jianlong Biochemical Co., Ltd. v. United States*,
   Slip Op. 17-170 (Ct. Int'l Trade Dec. 21, 2017) ..............................................13

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024)...........................................................................................8

*Massachusetts v. EPA*,
   549 U.S. 497 (2007)...........................................................................................14

*Saha Thai Steel Pipe Co. v. United States*,
   661 F. Supp. 1198 (Ct. Int'l Trade 1987) .........................................................13

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943).............................................................................................13

**Statutes**

16 U.S.C. § 1361(1) ...................................................................................................1

16 U.S.C. § 1361(2) ...................................................................................................1

16 U.S.C. § 1371(a)(2) ...............................................................................................1

16 U.S.C. § 1371(a)(2)(A) .........................................................................................2

**Other Authorities**

50 C.F.R.

Part 216 ...........................................................................................................7

§ 216.24(h)(1)(i) .........................................................................................2, 4

§ 216.24(h)(1)(ii) ............................................................................................2

§ 216.24(h)(3)(iv) ...........................................................................................3

§ 216.24(h)(6)(ii) .........................................................................................2, 4

§ 216.24(h)(6)(iii) ...........................................................................................2

§ 216.24(h)(6)(iii)(A) ......................................................................................3

§ 216.24(h)(6)(iii)(B) ......................................................................................3

§ 216.24(h)(6)(iii)(C) ......................................................................................3

§ 216.24(h)(7) .............................................................................................2, 4

§ 216.24(h)(8)(i) .............................................................................................4

§ 216.24(h)(8)(iv) ...........................................................................................4

§ 216.24(h)(8)(vii) ..........................................................................................5

§ 216.24(h)(9) .................................................................................................4

§ 216.24(h)(9)(ii)(B)-(C) ................................................................................4

81 Fed. Reg. 54,390 (Aug. 15, 2016) (codified at 50 C.F.R. § 216.0) ...........................2

90 Fed. Reg. 42,395 (Sept. 2, 2025) ...........................................................................5

# INTRODUCTION

The National Fisheries Institute; Restaurant Law Center; Phillips Foods, Inc.; Heron Point Seafood, LLC; Newport International of Tierra Verde, Inc.; 3Fish, Inc.; Handy Seafood Inc.; Shaw's Southern Belle Frozen Foods, Inc.; Supreme Crab & Seafood, Inc.; Cebu Pacific LLC; Byrd International Inc., and Crustacea Seafood Company, Inc. (collectively, "Intervenor-Defendants" or "NFI et al.") submit this response in opposition to Plaintiffs' Motion to Enforce Settlement Agreement, ECF 40. Plaintiffs in effect seek restoration of an embargo that, if reimposed, would in rapid order freeze supply chains; result in loss of contracts, and trigger layoffs of Intervenor-Defendants' U.S. workers—all of whom are reliant on raw material lawfully sourced pursuant to the Order issued by this court in Case No. 1:25-cv-0223-JAL ("*NFI* Order"). Plaintiffs make no showing that any marine mammals have been harmed as a result of that Order. The Court should deny the Motion.

# BACKGROUND

## I.    Marine Mammal Protection Act

Congress enacted the Marine Mammal Protection Act ("MMPA") in 1972 to protect and restore marine mammal populations that "are, or may be, in danger of extinction or depletion as a result of man's activities." 16 U.S.C. § 1361(1). In doing so, Congress declared that marine mammal species and populations "should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part, and, consistent with this major objective, they should not be permitted to diminish below their optimum sustainable population." *Id.* § 1361(2).

To advance these objectives in the international context, the MMPA authorizes the Secretary of the Treasury to "ban the importation of commercial fish or products from fish which

have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." 16 U.S.C. § 1371(a)(2). In determining whether to impose such an import ban, the Secretary of Commerce "shall insist on reasonable proof from the government of any nation from which fish or fish products will be exported to the United States of the effects on ocean mammals of the commercial fishing technology in use" for the exported products. *Id.* § 1371(a)(2)(A).

## II.    MMPA Implementing Regulations

The National Marine Fisheries Service ("NMFS") has promulgated regulations establishing a framework for determining whether individual foreign export fishery comply with the MMPA's import provisions. 81 Fed. Reg. 54,390 (Aug. 15, 2016) (codified at 50 C.F.R. § 216.0) ("Final Import Rule"). Under these regulations, "a fish or fish product caught with commercial fishing technology which results in the incidental mortality or incidental serious injury of marine mammals in excess of U.S. standards is any fish or fish product harvested in an exempt or export fishery for which a valid comparability finding is not in effect." 50 C.F.R. § 216.24(h)(1)(i).

Central to the Final Import Rule are Comparability Findings ("CFs"). The regulations provide that it is unlawful to import fish or fish products into the United States for commercial purposes if the product was caught or harvested in a fishery that does not have a valid comparability finding at the time of import, or if it is not accompanied by a required Certification of Admissibility or other documentation identified by NMFS indicating that the product is not subject to an import prohibition. *Id.* § 216.24(h)(1)(ii).

Before issuing a CF, NMFS must make specified findings and consider mandatory regulatory factors. *Id.* § 216.24(h)(6)(iii), (h)(7). In doing so, NMFS "shall consider documentary

evidence provided by the harvesting nation and relevant information readily available from other sources." *Id.* § 216.24(h)(6)(ii). When identifying foreign commercial fishing operations as exempt or export fisheries, NMFS may also rely on information from published literature and reports on fishing vessels, regional fishery management organizations, nongovernmental organizations, industry organizations, academic institutions, and citizens and citizen groups. *Id.* § 216.24(h)(3)(iv).

As a threshold matter, NMFS must find that the harvesting nation: (1) "[p]rohibits the intentional mortality or serious injury of marine mammals in the course of commercial fishing operations"; and (2) "[d]emonstrates that it has procedures to reliably certify that exports of fish and fish products to the United States are not the product of an intentional killing or serious injury of a marine mammal." *Id.* § 216.24(h)(6)(iii)(A). NMFS must further determine that the harvesting nation "maintains a regulatory program with respect to the fishery that is ***comparable in effectiveness*** to the U.S. regulatory program with respect to incidental mortality and serious injury of marine mammals in the course of commercial fishing operations." *Id.* § 216.24(h)(6)(iii)(B) (emphasis added).

To be "comparable in effectiveness," the foreign regulatory program must "provide[] for, or effectively achieve[] comparable results as," including marine mammal stock assessments estimating population abundance; calculation of "bycatch limits" using potential biological removal ("PBR") or a comparable scientific metric; implementation of measures designed to reduce incidental morality and serious injury below the bycatch limit; monitoring procedures sufficient to estimate incidental mortality and serious injury, including an indication of statistical reliability; and a comparison showing that the fishery does not exceed the bycatch limit. *Id.* § 216.24(h)(6)(iii)(C).

NMFS must also consider additional factors, including (a) U.S. implementation of its regulatory program for similar marine mammal stocks and similar fisheries; (b) the extent to which the harvesting nation has successfully implemented measures to reduce incidental mortality and serious injury of marine mammals to levels below the bycatch limit; (c) whether measures for the export fishery "have reduced or will likely reduce the cumulative incidental mortality and serious injury of each marine mammal stock below the bycatch limit"; and (d) other relevant facts and circumstances, including the history and nature of interactions with marine mammals, population size and trends, population-level impacts, and conservation status. *Id.* § 216.24(h)(7).

Where a harvesting nation's submission is incomplete or insufficient, NMFS must "draw reasonable conclusions regarding the fishery based on readily available and relevant information from other sources," including information concerning analogous fisheries. *Id.* § 216.24(h)(6)(ii). A CF, once issued, is generally valid for four years unless otherwise specified. *Id.* § 216.24(h)(8)(iv). Absent a valid CF, the Secretaries of the Treasury and Homeland Security are required to prohibit the importation of fish and fish products for which NMFS has not issued or has denied a valid finding. *Id.* § 216.24(h)(1)(i), (h)(9). If NMFS denies a CF, the regulations permit the harvesting nation to reapply at any time and require NMFS to decide within 90 days of receiving a complete submission. *Id.* § 216.24(h)(9)(ii)(B)-(C).

## III.    The *Lutnick* Agreement

In the Stipulated Settlement Agreement attached to the Stipulated Dismissal (ECF 29) (the "*Lutnick* Agreement"), Defendants agreed to "issue final comparability findings for all harvesting nations" on or before September 1, 2025 "[p]ursuant to 50 C.F.R. § 216.24(h)(8)(i)" and to "identify and prohibit the importation of fish and fish products into the United States from all

harvesting nations or fisheries for which NMFS has denied a comparability finding" on January 1, 2026 "[p]ursuant to 50 C.F.R. § 216.24(h)(9)."

The *Lutnick* Agreement established a schedule for implementation of the Final Import Rule but did not mandate any particular substantive outcomes. Although the Agreement limited the settling plaintiffs' ability to challenge individual CFs until January 1, 2026, that limitation did not bind third parties. Indeed, the Agreement expressly preserved NMFS's discretion to reconsider comparability findings or to comply with court orders enjoining their enforcement. Section 3 of the Agreement provides:

> <u>Discretionary Review of Comparability Findings</u>. For avoidance of doubt, NMFS may reconsider a comparability finding in accordance with 50 C.F.R. § 216.24(h)(8)(vii), or comply with a court order enjoining the enforcement of a comparability finding, notwithstanding the obligations provided in this Agreement.

ECF 29 at 10.

## IV.    The September 2025 Comparability Findings

Acting through the National Oceanic and Atmospheric Administration ("NOAA") and NMFS, the Department of Commerce issued CF determinations in September 2025 for 240 fisheries across 46 nations. Several of those determinations were negative, resulting in import prohibitions that, effective January 1, 2026, would have barred the entry of certain seafood products critical to Intervenor-Defendants—including products supplying nearly the entire U.S. market for pasteurized blue swimming crab ("BSC") meat. *See* 90 Fed. Reg. 42,395 (Sept. 2, 2025) ("Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection Act—Notification of Comparability Findings and Implementation of Import Restrictions; Certification of Admissibility for Certain Fish Products"). The threatened prohibitions would eliminate approximately 89% of the U.S. supply of pasteurized blue swimming crab, for which no domestic substitute exists. Intervenor-Defendants faced the imminent loss of hundreds of millions

of dollars in annual revenue, the collapse of supply chains built over decades, and the layoff of hundreds of workers.

Federal Defendants met the deadline imposed by the *Lutnick* Agreement. Plaintiffs now seek to prevent the parties directly affected by those determinations from obtaining judicial review. But nothing in the *Lutnick* Agreement contemplated insulating subsequent agency action from challenge by non-settling parties, and such a result would conflict with settled principles of administrative law.

## V.    The *NFI* Settlement

On October 9, 2025, NFI and other plaintiffs filed an action in this Court challenging several of the September 2025 CFs applicable to BSC fisheries and seeking relief from the resulting import bans. *See* ECF 2, Case No. 1:25-cv-0223-JAL. The complaint alleged that NMFS's determinations were arbitrary, capricious, and in excess of statutory authority under the MMPA, and that those determinations failed to consider the "devastating domestic and international economic consequences" they were already causing. Compl. ¶ 2. The complaint further alleged that the determinations "will prohibit the lawful importation of the only commercially viable sources of BSC meat," forcing plant shutdowns, layoffs, and permanent loss of market share. Compl. ¶¶ 2-3. NFI et al. explained that NMFS relied on a standardized, checklist-driven methodology that failed to consider fishery-specific evidence, disregarded readily available scientific information, and departed from the results-oriented framework mandated by the statute and regulations. NFI et al. further alleged that the agency's reliance on default assumptions, its artificially constrained administrative record, and its abrupt imposition of sweeping import prohibitions reflected serious procedural defects and ignored substantial economic and reliance interests.

On October 14, 2025, NFI et al. moved for a preliminary injunction, demonstrating immediate and irreparable harm and a likelihood of success on the merits. ECF 17, Case No. 1:25-cv-0223-JAL. Defendants moved to stay the proceedings (ECF 21, Case No. 1:25-cv-0223-JAL), which NFI et al. opposed (ECF 22, Case No. 1:25-cv-0223-JAL), and NFI et al. subsequently moved to expedite consideration (ECF 23, Case No. 1:25-cv-0223-JAL). The Court granted expedition in light of "the immediate and compounding harm alleged and the looming effective date of the measure at issue." ECF 24. On October 22, 2025, plaintiffs in the *Lutnick* matter moved to intervene in the *NFI* case (ECF 25, Case No. 1:25-cv-0223-JAL), though that motion was never adjudicated.

On October 30, 2025, the parties entered into a settlement providing for a 180-day stay of the challenged import bans while NMFS reconsidered the CFs for five specific blue swimming crab fisheries in Vietnam, the Philippines, Indonesia, and Sri Lanka. *See* Joint Stipulation of Dismissal, ECF 38, Case No. 1:25-cv-0223-JAL. The Court entered the Joint Stipulation and Order on October 31, 2025. ECF 41, Case No. 1:25-cv-0223-JAL.

The Order expressly stayed the January 1, 2026 effective date of the import bans for the identified fisheries pending NMFS's reconsideration and required the agency to conduct that reconsideration under defined deadlines and through a transparent process. *Id.* at 4–5. In effect, the Order stayed the challenged CFs and suspended their enforcement. *Id.*

Intervenor-Defendants have made substantial commercial and operational decisions in reliance on the stayed import bans. They have continued sourcing product, fulfilling contracts, and employing U.S. workers based on the lawful stay provided by the *NFI* Order. Rescission of the *NFI* Order would strand supply chains, result in loss of contracts and food waste, increase

consumer prices, and threaten the viability of their businesses, while reinstating the very CFs whose deficiencies prompted reconsideration in the first instance.

## ARGUMENT

### I.    The *Lutnick* Agreement Entitled Plaintiffs to a Process, Not an Outcome

The *Lutnick* Agreement required Defendants to issue CFs and any corresponding import prohibitions in accordance with the MMPA's implementing regulations and on an expedited timeline. Its terms obligated NMFS to undertake the prescribed regulatory process—collecting information, applying the statutory and regulatory criteria, and issuing decisions consistent with 50 C.F.R. Part 216—but did not require NMFS to reach any predetermined substantive outcome. Nothing in the Agreement mandates that particular fisheries receive positive or negative CFs, nor that an import ban be imposed on any specific fishery. Each CF, like any other final agency action, must stand or fall on the governing statute, regulations, and administrative record.

This distinction between process and outcome is fundamental. Settlement agreements involving agency action commonly require agencies to meet procedural obligations or deadlines, but they cannot compel an agency to prejudge the substance of its decisions or relinquish its statutory discretion. Agencies remain bound by the statutes they administer, and courts retain an independent obligation to ensure that agency action complies with those statutes. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). Put simply, an agency cannot lawfully bind itself, through settlement, to a result that the governing statute permits only through reasoned decision-making.

Courts have long recognized that agencies may not use settlement agreements to bind themselves to substantive outcomes that Congress has committed to their discretion. *See, e.g.*, *Decatur v. Paulding*, 39 U.S. 497, 506–07 (1840) (explaining that when Congress imposes

discretionary duties, an executive official must exercise independent judgment and cannot be compelled to reach a predetermined outcome); *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380 (1947) (holding that duly published regulations bind the Government and override contrary representations by agents). While agencies may agree to procedural steps, timelines, or reconsideration, they may not contract away their obligation to exercise reasoned judgment in accordance with statute. A settlement that purports to lock in regulatory results—rather than require lawful decision-making—would exceed the agency's authority and conflict with the governing statute.

This principle applies with particular force where, as here, Congress has prescribed a detailed, evidence-based framework for agency determinations and has subjected those determinations to judicial review. The MMPA requires NMFS to assess CFs based on specific statutory and regulatory criteria and to support those determinations with reasoned analysis grounded in the administrative record. Any agreement read to foreclose reconsideration or judicial review of those determinations would impermissibly displace the statutory scheme Congress enacted.

Thus, although NMFS agreed to complete the CF process by specified deadlines, it remained fully obligated to comply with all applicable statutory and regulatory requirements, and its resulting determinations remain subject to judicial review under the Administrative Procedure Act ("APA"). The *Lutnick* Agreement itself confirms this point, expressly preserving NMFS's obligation to "comply with a court order enjoining the enforcement of a comparability finding, notwithstanding the obligations provided in this Agreement." ECF 29 at 10. This express reservation underscores that the Agreement was never intended to shield CFs from lawful reconsideration or judicial oversight.

Plaintiffs nevertheless seek to enforce a particular outcome of the CF process and to insulate that outcome from challenge—while reserving their own ability to contest CFs they disfavor. But the benefit of Plaintiffs' bargain was limited: NMFS committed to issue CFs in accordance with law and on a defined schedule, not to impose or preserve any specific import ban. Plaintiffs therefore cannot invoke the Agreement to compel the continuation of import prohibitions that NMFS has since agreed to reconsider based on identified deficiencies.

Allowing Plaintiffs to enforce a specific substantive outcome—namely, the imposition of import bans on the five fisheries effective January 1, 2026—would improperly transform the *Lutnick* Agreement into a mechanism for bypassing the MMPA's statutory framework. Such a reading would conflict with the statute, undermine NMFS's expert judgment, and impermissibly rewrite the settlement to impose obligations the parties did not assume.

Separation of powers principles independently confirm that Plaintiffs' interpretation cannot prevail. Federal courts enforce settlement agreements as contracts, not as mechanisms to dictate substantive regulatory outcomes that Congress has committed to agency discretion. While a court may require an agency to perform what it agreed to do—such as meet deadlines or undertake reconsideration—it may not compel the agency to reach a particular regulatory result absent a clear statutory mandate.

Reading the *Lutnick* Agreement to require the continued enforcement of specific import bans would improperly enlist the Court in supervising substantive agency decision-making, rather than ensuring compliance with the law. Article III does not permit courts to transform procedural settlements into binding policy directives, particularly where Congress has prescribed a detailed framework for agency action and judicial review.

10

Plaintiffs' interpretation would also raise serious concerns for regulated parties that were not signatories to the *Lutnick* Agreement, including Defendant-Intervenors. The MMPA and the APA contemplate that parties directly affected by agency action may seek judicial review of final determinations that impose legal consequences. The Supreme Court has held that courts may restrict review of agency action "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent." *Abbott Labs. v. Gardner,* 387 U.S. 136, 141 (1967). Reading the Agreement to bar or effectively nullify such review would deprive non-settling parties of their statutory right to challenge agency action that directly affects their commercial interests.

Nothing in the *Lutnick* Agreement suggests that third parties waived their rights under the APA, nor could such a waiver be imposed by agreement between the agency and unrelated plaintiffs. Absent a clear and express statutory directive, settlement agreements cannot be construed to extinguish the procedural rights of parties who were not before the court.

At most, Plaintiffs may seek assurance that NMFS complied with the Agreement's procedural commitments and issued CFs by the agreed-upon deadlines. They may not use the Agreement as a vehicle to entrench CFs that are alleged to be flawed and that NMFS has agreed to reconsider pursuant to lawful process.

## II.    The *NFI* Order is Compatible with the *Lutnick* Agreement

Plaintiffs' Motion to Enforce rests on the premise that the *NFI* Order violates the *Lutnick* Agreement. That premise is incorrect. Both agreements require NMFS to comply fully with the MMPA and its implementing regulations when issuing CFs and determining whether import restrictions are warranted.

The two agreements are fully compatible because both require NMFS to act within its statutory authority. Plaintiffs' theory would have troubling consequences for administrative law

more broadly. If accepted, it would allow agencies to render otherwise reviewable decisions effectively immune from challenge by embedding them within the implementation of a settlement agreement. That approach would dangerously elevate settlement timing over statutory compliance and permit agencies to avoid scrutiny of substantively deficient actions so long as they were issued by a court-imposed deadline.

The APA does not permit agencies to insulate final actions from review through procedural maneuvering. Nor does it allow courts to treat time-limited compliance with a settlement as a substitute for reasoned decision-making. The *NFI* Order avoids these concerns by preserving the agency's obligation to correct potential deficiencies through reconsideration, rather than freezing contested determinations in place.

The *Lutnick* Agreement obligated NMFS to complete the CF process in accordance with the governing statutory and regulatory framework and within specified deadlines. It did not dictate the outcome of those determinations or require NMFS to impose import bans regardless of the evidentiary record. To the contrary, it preserved the agency's duty to exercise its judgment consistent with the law and to issue decisions subject to APA review.

The *NFI* Order operates within that same framework. It requires NMFS to reconsider certain CFs in response to a complaint alleging that the agency failed to comply with the MMPA and the APA. *See* ECF 41, Case No. 1:25-cv-0223-JAL at 3. Plaintiffs in the *NFI* action sought declaratory relief and vacatur of the CFs issued in the September 2, 2025 rule. *Id.* at 4. The resulting Order reflects the Federal Defendants' agreement to set aside the challenged import bans temporarily and to reconsider the relevant CFs.

The temporary stay of import restrictions does not direct NMFS to reach any particular outcome on reconsideration, nor does it relax the procedural or substantive standards governing

CF determinations. Plaintiffs have made no showing that any marine mammal has been harmed during the period the *NFI* Order has been in effect. The stay has preserved jobs, supply chains, and businesses while NMFS undertakes reconsideration—with no demonstrated cost to marine mammal conservation. It continues to preserve the status quo while the agency undertakes a reconsideration process consistent with the MMPA, its regulations, and the APA. The *NFI* Order therefore complements, rather than contradicts, the obligations imposed by the *Lutnick* Agreement.

Read together, the two agreements reflect a consistent and coherent approach: NMFS must act within the bounds of its statutory authority, adhere to required procedures, and issue reasoned decisions supported by the administrative record. Plaintiffs' assertion of conflict between the agreements mischaracterizes their respective scope. Plaintiffs' real disagreement is with NMFS's substantive judgment to reconsider certain CFs—not with any purported incompatibility between the court orders or settlements themselves.

Plaintiffs' motion also exceeds the proper scope of equitable relief available on a motion to enforce a settlement. Such motions are designed to ensure compliance with the terms of an agreement—not to expand those terms or obtain relief that would otherwise require satisfaction of the APA's standards for judicial review.

Here, Plaintiffs seek not enforcement of the *Lutnick* Agreement's procedural commitments, but substantive relief that would effectively reinstate contested agency action without review on the administrative record. The APA provides the exclusive framework for evaluating the lawfulness of such action, and a motion to enforce cannot be used to bypass that framework or to resurrect agency determinations that are subject to reconsideration and challenge.

III.    **Each Agency Action is Separate and Must be Judged Under the Administrative Procedure Act and its Own Administrative Record**

Plaintiffs cannot rely on the *Lutnick* Agreement to place any particular CF determination beyond scrutiny under the APA. Judicial review under the APA requires courts to evaluate each final agency action based on the explanation the agency provided and the evidence it considered at the time of that action. As this Court has recognized, "the scope of judicial review is normally confined to information contained in the administrative record." *Saha Thai Steel Pipe Co. v. United States*, 661 F. Supp. 1198, 1201 (Ct. Int'l Trade 1987).

"The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). Courts must evaluate agency action based on the reasoning the agency actually provided and the record it compiled, not on external agreements or post hoc explanations. *See, e.g.*, *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 ("The courts may not accept appellate counsel's post hoc rationalizations for agency action; *Chenery* requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself."); *Inner Mongolia Jianlong Biochemical Co., Ltd. v. United States*, Slip Op. 17-170 (Ct. Int'l Trade Dec. 21, 2017) (remanding where Commerce's stated rationale was unsupported in the record and could not be sustained under *Chenery*). That principle is especially important in cases involving trade restrictions, where agency determinations carry immediate and substantial commercial consequences such as those at issue here. Judicial review ensures that such determinations reflect reasoned decision-making rather than mere procedural happenstance.

Treating CF determinations as insulated from review because they were issued pursuant to a settlement would invert this framework, substituting contractual enforcement for statutory compliance and undermining the Court's role under the APA.

14

A settlement agreement cannot alter the nature of an agency action for purposes of APA review, nor can it insulate that action from challenge. Each CF determination, each decision to impose or stay an import restriction, and each reconsideration constitutes a distinct administrative action governed by its own reasoning and supporting record. Even where actions arise under the same statutory scheme or involve related fisheries, they must stand or fall on the adequacy of the agency's explanation and evidentiary support. *See Massachusetts v. EPA*, 549 U.S. 497 (2007).

Plaintiffs' interpretation of the *Lutnick* Agreement would circumvent these principles by converting time-limited procedural commitments into substantive immunities from review. That approach would undermine the APA's core function, invite post hoc rationalization, and deprive affected parties of meaningful judicial review. Treating each CF as a separate final agency action is therefore not only doctrinally required, but essential to preserving the integrity of the statutory scheme Congress enacted.

The APA also requires agencies to account for serious reliance interests when altering or enforcing regulatory determinations. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Here, regulated parties structured supply chains, contracts, and compliance efforts in response to the stayed import bans and the agency's agreement to reconsider the challenged CFs. They have continued to employ American workers, fulfill customer obligations, and maintain the infrastructure necessary to import and process blue swimming crab—all in lawful reliance on the *NFI* Order. Abrupt reinstatement of those bans—without completion of the reconsideration process and without a reasoned explanation grounded in the administrative record—would disregard those reliance interests, freeze supply chains, strand inventory, and force immediate layoffs—with no corresponding benefit to marine mammal conservation, which further underscores the need for individualized APA review of each agency action.

15

Because NMFS's decision to enter the *Lutnick* Agreement and its subsequent decisions regarding individual CFs are legally distinct actions, this Court must assess each one independently based on the agency's contemporaneous justification and record. The APA demands no less.

## CONCLUSION

For the foregoing reasons, Intervenor-Defendants respectfully request that the Court deny Plaintiffs' Motion to Enforce Settlement Agreement. Granting the Motion would reimpose an embargo that would devastate American businesses and workers, with no showing by Plaintiffs that any marine mammal has been harmed by the *NFI* Order.

Respectfully submitted,

Dated: January 2, 2026                                    /s/ Ashley Akers
                                                         Ashley Akers
                                                         Rafe Petersen
                                                         Kamran Mohiuddin
                                                         Maggie Pahl
                                                         HOLLAND & KNIGHT LLP
                                                         800 17th Street N.W., Suite 1100
                                                         Washington, D.C. 20006
                                                         Tele: 202-441-5870
                                                         Ashley.Akers@hklaw.com
                                                         Rafe.Petersen@hklaw.com
                                                         Andrew.Mcallister@hklaw.com
                                                         Kamran.Mohiuddin@hklaw.com
                                                         Maggie.Pahl@hklaw.com

                                                         *Attorneys for Applicant-Intervenor-Defendants*

**CERTIFICATE OF COMPLIANCE**

I, Ashley Akers, hereby certify that this brief complies with the word count limitations as provided for in the Court's Standard Chambers Procedures 2(B) because it contains 4,337 words, excluding the parts of the brief exempted by Standard Chambers Procedures 2(B)(1)(c).

/s/ Ashley Akers
 Ashley Akers

*Attorney for Intervenor-Defendants*

**CERTIFICATE OF SERVICE**

I, Ashley Akers, one of the attorneys for Intervenor-Defendants, certify that the foregoing document was filed electronically with the Court's Case Management/Electronic Case Filing (CM/ECF) system on January 2, 2026. The Court and/or Clerk of the Court may serve and give notice to counsel by CM/ECF electronic transmission.

/s/ Ashley Akers
　Ashley Akers

*Attorney for Intervenor-Defendants*

18